# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| WAYNE WATSON, *et al.*, |
| Plaintiffs, |
| v. |
| SONNY PERDUE, Secretary, U.S. Department of Agriculture, *et al.*, |
| Defendants. |

Case No. 1:19-cv-01633 (TNM)

## MEMORANDUM OPINION

For generations, an African American family has farmed cotton and soybeans in the Mississippi River Delta near Mound Bayou, Mississippi. In the 1980s and 90s, the Watsons pledged their farmland as security for various loans from the U.S. Department of Agriculture's Farm Service Agency, including a Farm Ownership Loan. That Farm Ownership Loan is delinquent, and the Agency has started foreclosure proceedings against the Watsons' farmland. Wayne Watson and his siblings seek a preliminary injunction to enjoin the foreclosure. They claim that they have made payments toward the Farm Ownership Loan but the Agency has misapplied those payments to debts it should have forgiven after their parents' successful discrimination claim under the *Pigford* Consent Decree. The Agency argues that it properly credited the Watsons' accounts with *Pigford* debt relief, and in any event, the allegedly misapplied payments are not enough to bring the Farm Ownership Loan current. For the reasons below, the Court will deny the Watsons' Motion for Preliminary Injunction.

## I.

Between 1988 and 1995, Annie and James Watson, Jr. received Operating, Emergency, and Farm Ownership Loans from the Agency. *See* Miller Decl. ¶ 1, ECF No. 18-1. The

Operating Loan program, Emergency Loan program, and Farm Ownership Loan program are separate, distinct loan programs. *See* Monitor Update No. 10 at 2, ECF No. 12-6.[1] These distinctions turn out to be critical to the Watsons' entitlement to relief.

As of 1995, the Watsons were behind on their loan payments. Miller Decl. ¶ 1–2. So, in October of that year, they signed an agreement with the Agency to restructure their debt. *Id.* ¶ 2; *see also* Shared Appreciation Agreement ("SAA"), ECF No. 18-4. The Agency agreed to write down nearly $260,000 of the Watsons' debt. SAA at 2. The write-down extinguished all the Watsons' outstanding Operating and Emergency Loans and reduced their obligation on the Farm Ownership Loan by about $16,000. *See* Miller Decl. ¶ 1; *see also* Loan Analysis at 18, ECF No. 18-3. After the write-down, the Watsons were left with a balance on their Farm Ownership Loan of just under $140,000. Miller Decl. ¶¶ 1–2; *see also* SAA at 1; Loan Analysis at 1–2, 18.[2]

In exchange for the write-down, the Watsons entered into a Shared Appreciation Agreement (the "Agreement"). *See* SAA at 1–2. A Shared Appreciation Agreement is an agreement between the Agency and a borrower that requires the borrower who has received debt write-down on a loan secured by real estate to repay the Agency some or all the write-down received. *See* Miller Decl. ¶ 3. How much the borrower owes is based on a percentage of any increase in the value of the real estate securing a Shared Appreciation Agreement at a future date. *See id.*; SAA at 2. The Watsons used their farmland as security. SAA at 1, 3. The Agreement had a ten-year term, and the Watsons agreed to pay the Agency a "recapture amount"

---

[1] All citations are to the page numbers generated by the Court's CM/ECF system.

[2] The Agency re-amortized the remaining Farm Ownership Loan balance over 34 years at 5% interest with a 5-year partial deferral of annual payments. Miller Decl. ¶ 2. The Watsons owed $6,008 per year for the first five years and $9,001 per year from that point. *Id.* As part of the re-amortization, the Agency designated the Farm Ownership Loan as loan 41-32; before, it was loan 41-29. *See* Suppl. Miller Decl. ¶¶ 1–2, ECF No. 21-1; *see also* Farm Ownership Loan at 1–6, ECF No. 18-2.

equal to 50 percent of any positive appreciation in the market value of their farmland, upon maturation. *Id.* at 2; Miller Decl. ¶ 24. In sum, as of 1995, the Watsons had an outstanding Farm Ownership Loan with the Agency and a recapture liability that matured in 2005.

In 1999, James Watson, Jr., sought relief under the *Pigford* Consent Decree. *See Pigford* Claim Sheet, ECF No. 12-9. The *Pigford* Consent Decree arose out of a class action by African American farmers alleging the Agency had discriminatorily denied them loans, "delay[ed] the processing of their applications or approv[ed] the[ir] [applications] for insufficient amounts or with restrictive conditions." *Pigford v. Glickman*, 185 F.R.D. 82, 87 (D.D.C. 1999). Relevant here, the Consent Decree allowed farmers who believed that the Agency had discriminated against them to submit claims to a court-appointed adjudicator. *See* Consent Decree, ECF No. 1-5 at 2, 13–17; *see also, e.g.*, Decision of Adjudicator, ECF No. 18-6. If the Adjudicator decided in a claimant's favor, the claimant was entitled to the relief of all his "outstanding debt to [the U.S. Department of Agriculture] that was incurred under, or affected by, the program(s) that was/were the subject of the . . . claim(s) resolved in [his] favor." Consent Decree at 15.

James Watson alleged the Agency had discriminated against his applications for Operating Loans starting in 1989. *Pigford* Claim Sheet at 3. The Adjudicator originally denied his claim. Decision of Adjudicator at 2–3. But Mr. Watson appealed, and upon reexamination, the Adjudicator determined that Mr. Watson had "established by substantial evidence that he [was] entitled to recover under the terms of the Consent Decree." *See* Decision on Reexamination at 3, ECF No. 12-11. The Adjudicator directed that "as required by the Consent Decree, [Mr. Watson] . . . shall be relieved of any USDA Operating Loan debt incurred . . . between February 2, 1989 and December 31, 1996." *Id.*

3

In the interim, the Agreement matured. The Agency calculated the recapture amount due and determined that the Watsons owed $60,819. Recapture Calculation, ECF No. 18-9. The Agency created an Equity Recapture Account ("ERA") (No. 41-40) to track the balance of the recapture amount due. Miller Decl. ¶ 8. The Watsons made two payments toward the ERA: $8,000 in 2008 and $14,990.77 in 2011. *Id.* ¶ 9.

*Pigford* debt relief covered the remaining balance of the ERA. *See id.* ¶¶ 11, 24; *see also* ERA Ledger, ECF No. 18-23. Recall that the Adjudicator ordered the Agency to grant debt relief to James Watson's Operating Loans incurred between 1989 and 1996, but the Agency wrote off those loans entirely under the Agreement—there was no debt left to relieve. Miller Decl. ¶ 11. So the Agency applied non-cash credits to the ERA in the amount equal to the *Pigford*-qualifying Operating Loans that it had written off. *See id.*; *see also* Debt Relief Summary, ECF 18-12; ERA Ledger at 1.[3] Between the Watsons' payments and the non-cash credits, the ERA was satisfied. Miller Decl. ¶ 24.

Meanwhile, the Watsons fell behind on their Farm Ownership Loan (No. 41-32). *Id.* ¶ 4. According to the Agency, the Farm Ownership Loan has been delinquent since 2000. *Id.* James Watson died in 2006, and Annie Watson died two years later. *Id.* ¶ 13. But their estates remained liable for the outstanding loans. *See id.* ¶ 14. Wayne, Troy, Fitzgerald, Rhonda, and Deborah Watson (collectively, the "Heirs") are heirs to the Watsons' estates, and Wayne Watson is also the executor of the estates. *See* Compl. at 1, ECF No. 1; TRO Hearing Tr. at 8–9. Starting in 2006, the Heirs have made payments toward the outstanding Farm Ownership Loan. *See* Wayne Watson Aff. ¶ 4, ECF No. 2-2 at 6–10.

---

[3] The Agency originally applied $135,796.56 in non-cash credits to the ERA, but it later applied another non-cash credit of $54,587.73. Miller Decl. ¶ 11. All told, the Watsons received more than $190,000 in non-cash credits. *Id.*

4

Even so, the Agency maintains that the loan is behind about $75,000. *See* Miller Decl. ¶ 4; Farm Ownership Loan Ledger, ECF No. 18-22; *see also* Summary of Payments, ECF No. 18-5. Thus, the Agency sent the Heirs a "Notice of Acceleration" on the delinquent loan. Notice of Acceleration, ECF No. 18-21. The Agency offered the Heirs three options: pay the loan balance in full, transfer the farmland to someone who was willing and able to assume the debt, or sell the farmland for market value and send the proceeds to the Agency. *Id.* at 4–5. The Heirs did not take any of those options. Miller Decl. ¶ 20.

So the Agency moved forward with foreclosure. *Id.* ¶ 21. In June 2019, it published a notice starting foreclosure. *Id.* It sent a "Notice of Sale" to all known heirs of the Watson Estates and published the Notice of Sale in the Bolivar County newspaper four times. *Id.* It scheduled the sale for July 1, 2019. *Id.*

The Heirs now seek to enjoin the sale, alleging that the Agency improperly implemented *Pigford* debt relief which caused the Farm Ownership Loan to become delinquent. *See generally* Compl. Their argument proceeds in three steps. First, the Agency wrongly implemented *Pigford* debt relief and should have forgiven the entire ERA using the non-cash credits awarded to the Watson. *Id.* at 6–14. Second, the Agency's failure to do so caused it to erroneously apply $22,990.77 in payments meant for the Farm Ownership Loan to the ERA. Prelim. Inj. Hearing Tr. ("PI Tr.") at 26–27, ECF No. 24; *see also* Mem. in Supp. of Mot. for Prelim. Inj. at 5–8 ("Pls.' Mem."), ECF No. 17-1. Finally, if the Agency had applied the $22,990.77 correctly, then it "could have reduced the account balance of the [Farm Ownership Loan] and possibly avoid[ed] foreclosure." Suppl. Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Suppl.") at 2, ECF No. 25.

The Court granted the Heirs' request for a temporary restraining order after an initial hearing. Order, ECF No. 16. The Heirs then moved for a preliminary injunction. *Id.*; Mot. for Prelim. Inj., ECF No. 17. The Court held a hearing on the motion. 7/15/19 Minute Entry.

The Heirs renewed their argument that "[s]erious questions regarding the proper application of the credits and the payments going to the merits are raised." *See* Pls.' Mem. at 5–8. But, according to the Agency, it granted the Watsons all the debt relief that they were entitled to under *Pigford* and applied payments to the Watsons' accounts properly. Defs.' Opp'n to Mot for Prelim. Inj. ("Defs.' Opp'n") at 8, ECF No. 18; Miller Decl. ¶ 22; *see also* PI Tr. at 9, 11–14, 42–43. And, the Agency argues, even if the Agency should have forgiven the entire ERA and applied all payments to the Farm Ownership Loan, the loan would still be delinquent. *See* Miller Decl. ¶ 24; *see also* PI Tr. at 43. The Agency has provided extensive documentation about the relevant loans and its management of the Watsons' accounts. *See* Exs. to Defs.' Opp'n, ECF No. 18-2–18-26.[4]

## II.

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The moving party must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing*

---

[4] After oral argument on the Motion for Preliminary Injunction, the Court ordered the parties to file supplemental briefing to address final questions about documents in the record and the Agency's representations at oral argument. *See* Order, ECF 20. Both parties complied. *See* Response to Court Order, ECF No. 21; Suppl. Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Suppl."), ECF No. 25.

*Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). When the Government is the opposing party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

How the Court should weigh the four factors "remains an open question." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). But if the plaintiff fails to establish a likelihood of success on the merits, the Court "need not proceed to review the other three preliminary injunction factors." *Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). The plaintiff cannot prevail without a "substantial indication of likely success on the merits." *Archdiocese of Wash. v. WMATA*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017) ("[A]bsent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." (internal quotation marks omitted)), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018).

### III.

### A.

The Agency first raises a challenge to the Heirs' standing. According to the Agency, the Heirs lack standing to sue because the estates of Annie and James Watson, Jr. are the real parties in interest. *See* Defs.' Opp'n at 7. Not so. The Agency concedes that Wayne Watson is executor of the Watsons' estates. *Id.* at 4, 7. As the executor, he can sue on behalf of the estates under his own name, even though he personally is not the real party in interest. Fed. R. Civ. P. 17(a). Indeed, counsel for the Heirs represented at the hearing on the Motion for a Temporary Restraining Order that Wayne Watson was acting in his capacity as executor. TRO Hearing Tr. at 9. The Agency appears to acknowledge that Wayne Watson has standing. *See* Defs.' Opp'n at 7.

Still, the Agency alleges that the other heirs lack standing. *Id.* But having established Wayne Watson's standing, the Court need not delve further. "To establish jurisdiction, the court need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). "[I]f constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim." *Mount'n States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

**B.**

The Heirs clear this initial hurdle, but they falter from there. They fail to show a substantial likelihood of success on the merits. They are suing to enforce the *Pigford* Consent Decree. *See* Compl. at 15. According to the Heirs, the Agency may not foreclose on the outstanding Farm Ownership Loan because it mishandled the Watsons' loan accounts. Under *Pigford*, they argue, the Agency should have forgiven the entire recapture amount, and thus the Agency wrongly applied $22,990.77 in payments to the ERA instead of the Farm Ownership Loan. If not for the Agency's errors, the Heirs "could have reduced the account balance of the [Farm Ownership Loan] and possible avoid[ed] foreclosure." Pls.' Suppl. at 2. Their argument fails on two fronts.

First, the Heirs have not shown that the Agency should have forgiven the entire recapture amount under *Pigford*. The Consent Decree required the Agency to "discharge all . . . outstanding debt . . . that was incurred under, or affected by, the program[] that was[] the subject of the . . . claim[] resolved in the class member's favor." Consent Decree at 15. James Watson's successful *Pigford* claim alleged discrimination related only to his applications for Operating Loans. *Pigford* Claim Sheet at 3. And the Adjudicator granted him relief only for Operating Loans. Decision on Reexamination at 3. So he was not entitled to debt relief for other loan

programs, like the Farm Ownership Loan program, because those loans were not "incurred under" or "affected by" the Operating Loan program.[5] *See* Monitor Update No. 10 at 2 (explaining that the Farm Ownership Loan program is separate and distinct from the Operating Loan program).

That much the Heirs concede. *See* Pls.' Suppl. at 3 ("[A] farm ownership loan . . . [is] not eligible for *Pigford* treatment because farm ownership loans were not part of the relief granted by the adjudicator to the Watsons."); *see also* PI Tr. at 29. But they argue that because the Agency wrote down the Operating Loans—that were subject to *Pigford* relief—under the Agreement, the recapture amount due under the Agreement was also subject to *Pigford* relief. *See* PI Tr. at 26–28.

The Heirs rely on guidance from the *Pigford* Monitor. Pls.' Mem. at 6–8. He recognized that in some cases, as here, a claimant will have already received debt forgiveness through USDA's loan servicing. Monitor Update No. 10 at 5. And sometimes the claimant remains liable to repay part of the debt: "for example, with a shared appreciation agreement that is signed after a debt write-down." *Id.* In those cases, "[i]f the original debt is forgiven under *Pigford*, the debt forgiveness applies to all claimant liability for that debt, including shared appreciation." *Id.*

Fair enough. But not all the original debt rolled into the Agreement was forgiven under *Pigford*. The Agreement identifies eight underlying loans, SAA at 1, and the Heirs have included copies of the promissory notes. *See* SAA Promissory Notes, ECF No. 3 at 1–23.[6]

---

[5] Debts "incurred under" or "affected by" the program that was the subject of a claimant's successful discrimination claim include:
    (1) Those debts identified by the Adjudicator as having been affected by discrimination, and
    (2) All later loans in the same loan program as the loans identified by the Adjudicator from the date of the first event on which the Adjudicator made a finding of discrimination.
*See* Monitor's Final Rep. on Good Faith Implementation of the Consent Decree ("Monitor's Final Rep.") at 65, *Pigford v. Vilsack*, No. 1:97-cv-01978 (D.D.C. Apr. 1, 2012), ECF No. 1812.

[6] The promissory note for the fourth loan listed ($23,296.39) is missing.

9

While most of those loans are *Pigford*-eligible Operating Loans, the Agreement also included servicing on the Farm Ownership Loan, not subject to *Pigford* debt relief. *See id.* at 23.[7] Indeed, under the Agreement, the Farm Ownership Loan received a more-than-$16,000 write-down. *See* Miller Decl. ¶ 1; *see also* Loan Analysis at 2.

So at least part of the recapture amount was attributable to *Pigford*-ineligible loans. The Agency argues that it had a right to apply payments to the ERA to satisfy that portion of the recapture amount. *See* PI. Tr. at 13–16, 32–33, 42–43. That accords with the Monitor's instruction. "[D]ebt forgiveness applies to all claimant liability"—"including shared appreciation"—"for [the original debt forgiven under *Pigford*]," Monitor Update 10 at 5, not to claimant liability for debts ineligible for *Pigford* relief. Indeed, because the portion of the recapture amount attributable to the Farm Ownership Loan was not "incurred under" or "affected by" the Operating Loan program, applying *Pigford* relief to that portion of the recapture amount would depart from the Consent Decree. *See* Consent Decree at 14–15 (granting relief only for debt "incurred under, or affected by, the program[] that was[] the subject of the . . . claim[] resolved in the class member's favor"); Decision on Reexamination at 3 (resolving Mr. Watson's claim in his favor only for Operating Loans); Monitor's Final Rep. at 65 (defining "incurred under" and "affected by").

The Heirs have no rejoinder. They point to no caselaw or authority requiring the Agency to forgive the portion of the recapture amount attributable to non-*Pigford*-qualifying loans. Indeed, they concede the Farm Ownership Loan "was not eligible for *Pigford* treatment" and that

---

[7] The top right corner of the promissory note suggests that the loan is an Operating Loan. But Mr. Miller explained that is a clerical error, and loan 41-29, which became loan 41-32, is a Farm Ownership Loan. *See* Suppl. Miller Decl. ¶¶ 2–3. Indeed, the Heirs acknowledge that 41-29 is a Farm Ownership Loan. *See* Pls.' Suppl. at 2–3. In any event, at least one other loan underlying the Agreement was an Emergency Loan, not eligible for *Pigford* relief. *See* SAA Promissory Notes, ECF No. 3 at 1; Miller Decl. ¶ 1; *see also* Suppl. Miller Decl. ¶ 2.

10

"is important because if the adjudicator does not find discrimination in a certain program, the debt is not deemed to have been 'incurred under or affected by discrimination.'" Pls.' Suppl. at 3. The Farm Ownership Loan "does not receive *Pigford* treatment." *Id.* at 4. They maintain only that all the loans underlying the Agreement were *Pigford*-eligible Operating Loans, *see* Pls.' Suppl. at 4, but the record does not support that contention, *see generally* SAA Promissory Notes.

"The moving party bears the burden of persuasion and must demonstrate, by a clear showing, that the request relief is warranted." *Thorp v. District of Columbia*, 317 F. Supp. 3d 74, 79 (D.D.C.) (cleaned up), *aff'd*, 2018 WL 6720512 (D.C. Cir. 2018) (per curiam). The Heirs have not done so here.

In any event, even if the Heirs are right that the Agency should have forgiven the entire recapture amount and applied payments only toward the Farm Ownership Loan, they have not shown that it would make a difference. The Heirs argue that the Agency wrongly applied approximately $23,000 in payments to the ERA. Pls.' Mem. at 4. But the Farm Ownership Loan is more than $75,000 delinquent. Miller Decl. ¶ 4; Summary of Payments; *see also generally* Farm Ownership Loan Ledger. So even if the Agency applied the $23,000 to the Farm Ownership Loan, the loan still would be more than $50,000 delinquent.

Finally, the Heirs complain that the Agency has been opaque about how it applied payments to the Watsons' accounts and what they owed. The Court agrees. But the Heirs' criticisms do not suggest the Agency failed to implement *Pigford* debt relief properly, causing the misapplication of funds. More, the Heirs have not shown that the Farm Ownership Loan is current or could be made current even if they prevailed on their underlying claim to enforce the Consent Decree. And they have cited no authority that prevents the Agency from foreclosing on

a demonstrably delinquent loan. Thus, the Heirs have failed to carry their burden to make a clear showing that they have a substantial likelihood of success on the merits. A preliminary injunction is not warranted.

## C.

Because the Heirs have not shown a likelihood of success of the merits, the Court "need not proceed to review the other three preliminary injunction factors." *Ark Dairy Coop. Ass'n*, 573 F.3d at 832. Even so, the Court briefly considers the remaining factors, starting with the likelihood of irreparable harm without injunctive relief. To obtain injunctive relief, a movant must establish that he is likely to suffer an irreparable injury without an injunction. *Winter*, 555 U.S. at 20. This factor weighs in the Heirs' favor.

Without an injunction, the Agency will move forward with foreclosure on the Watson family farm. The Agency argues that the loss of the family farm cannot constitute irreparable harm because "[e]conomic loss, does not, in and of itself, constitute irreparable harm." Defs.' Opp'n at 9 (citing *Wis. Gas Co. v. Fed. Energy Reg. Comm.*, 758 F.2d 669, 674 (D.C. Cir. 1985)). But losing a family farm is more than just an economic loss. It involves the loss of generations of family history, sweat-equity, and memories. Indeed, "it is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018) (quoting *7-Eleven, Inc. v. Khan*, 977 F. Supp. 2d 214, 234 (E.D.N.Y. 2013)). The Heirs have shown that absent an injunction, they likely will suffer irreparable harm, and that factor favors injunctive relief.

Even so, the final two factors, which merge when the Government is the party opposing an injunction, *Nken*, 556 U.S. at 434, weigh against the Heirs. There is a public interest in the collection of debts due to the public fisc. *Cf. United States v. Tilleras*, 709 F.2d 1088, 1090 (6th Cir. 1983) (holding that the federal government has an interest in protecting its funds). As already explained, the Agency has shown that with or without the allegedly misapplied payments, the Farm Ownership Loan is delinquent. Enjoining foreclosure here would delay collection of the debt due to the Agency, and "courts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 480 U.S. 531, 542 (1987)). The Heirs argue, however, that failing to enjoin the foreclosure would undermine the public interest in the proper implementation of *Pigford* relief. *See* Pls.' Mem. at 10–11. But having found that the Heirs have not shown that the Agency failed to implement *Pigford* relief properly, their argument carries little weight.

True, the Heirs have provided evidence that the Agency sent confusing and potentially inaccurate information about the amount due on the Farm Ownership Loan. *See* Due Payment Notices, ECF No. 14-1. But the record does establish that the Heirs took reasonable steps to clarify their obligations. The Heirs had notice of the Agency's intention to accelerate the Farm Ownership Loan in 2009; they went through an entire appeals process. *See* Miller Decl. ¶¶ 14–18. And even after the Heirs received the 2017 Notice of Acceleration, they waited more than a year before suing. More, comparing the letters sent by the Agency with the Heirs' payments, the Heirs could not have reasonably believed that the Farm Ownership Loan was satisfied. For example, in 2012, the Agency stated the loan was $35,548.58 delinquent, but the Heirs paid only $10,000. *Compare* Due Payment Notices at 1 *with* Farm Ownership Loan Ledger at 1–2. There

is no evidence that the Agency mislead the Heirs into think that the Farm Ownership Loan was current. Thus, because the Heirs have not shown that an injunction would serve the public interest or that the balance of equities clearly weigh in their favor, those factors cut against injunctive relief.

In the end, the balance of factors weighs against a preliminary injunction. "[T]he first and most important" factor, *Aamer*, 742 F.3d at 1038—likelihood of success on the merits—weighs against the Heirs. That alone may be enough to deny injunctive relief. *See Ark. Dairy Coop. Ass'n*, 573 F.3d at 832; *see also Jones v. Hurwitz*, 324 F. Supp. 3d 97, 100–01 (D.D.C. 2018). But the balance of equities and the public interest also cut against the Heirs. The Heirs' showing of a likelihood of irreparable harm absent an injunction does not overcome those other factors. The Heirs therefore have not established that they are entitled to an injunction.

**IV.**

For all these reasons, the Plaintiffs' Motion for a Preliminary Injunction is denied. A separate Order will issue.

Dated: September 17, 2019                                    TREVOR N. McFADDEN, U.S.D.J.